UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 25-CR-11 (PJS/SGE) |
| | ) | |
| v. Plaintiff, | ) | |
| | ) | **DEFENDANT'S POSITION REGARDING SENTENCING** |
| CHRISTOPHER ROBERT NELSON, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant, Christopher Robert Nelson, by and through his undersigned attorney, Kevin W. DeVore, submits this sentence position pursuant to Rule 83.10(e) of the Local Rules of the United States District Court for the District of Minnesota. Defendant respectfully requests the Court to sentence him to not more than 180 months. Such a sentence is sufficient, but not greater than necessary, to satisfy the intended purpose of sentencing under the guidelines and the law.

## I. PROCEDURAL HISTORY

### A. PLEA

On November 12, 2025, Mr. Nelson pled guilty to Count 1 of the 3-count indictment:

Count 1: Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) and (e);

### B. PLEA AGREEMENT

The parties agree that Count 1 results in an adjusted offense level of 42 (32 base + 4 minor victim + 4 sadistic or masochistic conduct + 2 computer). Both parties anticipate

a 3-level decrease for acceptance of responsibility pursuant to USSG §3E1.1. Finally, the government believes a 5-level increase applies for pattern of activity involving prohibited sexual conduct pursuant to USSG §4B1.5(b). Mr. Nelson does not agree with this 5-level increase. [1]

The resulting total offense level is either 43 (maximum level) or 39 (without the 5-level enhancement). Both parties agree the applicable criminal history category is I, which results in an advisory guideline range of life imprisonment on the high end and 262 to 327 months imprisonment on the low end. The mandatory minimum sentence is 180 months imprisonment, and the statutory maximum is 360 months.

Finally, the government has agreed recommend a sentence of no more than 300 months imprisonment.

### C. PSR RECOMMENDATION AND OBJECTIONS

The PSR differs from the plea agreement and recommends:

| | |
|---|---|
| Base offense level, USSG §2G2.1(a) | 32 |
| Victim under 12, USSG §2G2.1(b)(2)(A) | +4 |
| Sexual act or conduct, USSG §2G2.1(b)(2)(A) | +2 |
| Computer, USSG §2G2.1(b)(6)(B)(ii) | +2 |
| Adjusted Total Offense Level | 40 |
| Pattern of Activity, USSG §4B1.1 | +5 |

[1] Defendant maintains his objection to the 5-level enhancement for pattern of activity involving prohibited sexual conduct pursuant to USSG §4B1.5(b). Defendant inadvertently did not object to the PSR recommending this enhancement. Defendant will move for leave of the court requesting permission to file a late objection to this enhancement.

| | |
|---|---|
| Acceptance of Responsibility, USSG §3E1.1(a), (b) | -3 |
| TOTAL OFFENSE LEVEL | 42 |

## II. BACKGROUND AND DETAILS ABOUT THE DEFENDANT

GROWING UP

As outlined in the Pre-Sentence Report and psychosexual evaluation completed in this matter, Mr. Christopher Nelson is an individual whose early life history was positive for economic and familial stability, and he did not experience any highly disruptive life events. While he hit all his developmental milestones, Mr. Nelson did exhibit some challenges related to learning and development which impacted his educational adjustment. According to records from South St. Paul public schools, he was placed on an Individualized Educational Plan (IEP) in high school for transition services and educational accommodations and services that were required due to his presentation. It appears that services were likely in place earlier in his educational career as well.

Evaluations of Mr. Nelson during adolescence noted historical diagnoses of ADHD, which contributed to symptoms of distraction and inattention that affected his educational performance, as well as Tourette Syndrome (TS) which required speech and language therapy to assist with language fluency. Interestingly, ADHD is the most common diagnosis to be co-morbid with Tourette's, which often results in problems with concentration, hyperactivity, and impulsivity.[2] These are all symptoms which Mr. Nelson has struggled with throughout his lifetime and had a notable impact on his educational

[2] https://www.ninds.nih.gov/health-information/disorders/tourette-syndrome

development. As part of his IEP, testing was completed in 1991 which found that Mr. Nelson's intellectual functioning to be in the average to low average range.[3] Additional support was provided such as case management services to ensure that he got the necessary support to finish his schoolwork and receive additional accommodations as needed.

Mr. Nelson recalls feeling supported educationally in school but struggled socially likely in part due to the impacts of his TS. Tourette's is defined as "a neurological disorder that may cause sudden unwanted and uncontrolled rapid and repeated movements or vocal sounds called tics."[4] In Mr. Nelson's case, he had noticeable facial tics in the form of "shrugging" and "grimaces" as noted by his teachers.[5] "*I was a loner",* Mr. Nelson has stated. Additionally, the fact that his brother was popular and had lots of friends only made it more difficult for him growing up. Marie Nelson, Christopher's mother noted, "*It was hard for him to make friends. He had social anxiety, and when he was nervous, he would stutter. His tics also caused him to laugh inappropriately*".

His facial tics and stuttering contributed to Mr. Nelson's immense social anxiety throughout childhood and adolescence which caused a tremendous amount of isolation. Over time, Mr. Nelson began to exhibit symptoms of anxiety and depression due to his social isolation and anxiety, which largely went unnoticed and have gone untreated throughout his lifetime. This was only compounded by the bullying he experienced in school, as well as the two incidents where he was inappropriately sexually touched at sleepovers without consent, which he kept to himself. This marked the beginning of a

---

[3] South St. Paul Public School Records- IEP Evaluation
[4] *Id 2*
[5] *Id 2*

lifelong pattern of internalizing stressful situations, which prevented him from accessing help.

MENTAL AND EMOTIONAL HEALTH

Mr. Nelson's experiences of social anxiety and depression continued to be barriers to creating meaningful relationships over his lifetime, which contributed to his mental health symptomology. As discussed in the psychosexual evaluation, Mr. Nelson was not formally taught about sexuality and was not in any romantic relationships until early adulthood. This led to him learning about sexuality and relationships through pornography use starting in adolescence. As a young adult, he was in a handful of relationships, but none of them progressed past their initial stages- which was highly disappointing for Mr. Nelson. They also all had characteristics which limited their ability to be successful, such as living in different locations or speaking a different language than his partners. He continued to struggle with social anxiety which made finding romantic partners difficult, and he was so desperate for a relationship, that he entered into female relationships that were destined to fail.

The result of this dynamic was an increase of symptoms of anxiety and depression. After his first relationship ended, Mr. Nelson recalls feeling very depressed and self-medicating with alcohol. Thankfully this did not progress into a full-blown dependence, and he stopped drinking alcohol excessively. His anxiety continued to increase, as he continued to struggle forming romantic relationships. Mr. Nelson did not have any coping skills in place to address his mental health, and his habit of internalizing his experiences prevented him from reaching out to his support system. His depression and loneliness led

him to decide to meet his relational and sexual needs through pornography. Over time these types of sexual behaviors increased to online relationships and production of child pornography as outlined in the present indictment.

## III. PSYCHOSEXUAL EVALUATION

As a result of the present legal case, Mr. Nelson was referred for a psychosexual evaluation with Dr. Charlotte Gerth PhD., LP at Vantage Point Psychological Consultants. (A copy of the Psychosexual Evaluation Report is filed herewith.) The purpose of this evaluation was to provide more contextual information about Mr. Nelson's offense conduct and treatment needs, especially given his developmental history and lack of involvement in the criminal legal system. Ultimately, Dr. Gerth found that Mr. Nelson's intellectual functioning was within the average range and the following diagnoses were provided: Other specified disruptive, impulse-control, and conduct disorder, and Generalized anxiety disorder.[6]

Through testing and clinical interview, Dr. Gerth completed her assessment following the Risk Need Responsivity (RNR) framework, which works by targeting dynamic factors that are directly related to recidivism. Risk refers to both static and dynamic factors that influence individuals' likelihood of reoffending. Need refers to the presence of criminogenic needs that should be targeted to minimize their future risk. The responsivity part of this framework focuses on individuals' needs in order to make treatment recommendations that address both risks and needs in a way that will promote

[6] PSE- pg. 7; 13

effectiveness.[7] The following outlines all areas of Mr. Nelson's risks and needs related to his sexual recidivism risk.

***Risk***

In terms of risk, appropriate testing was completed to provide additional information on Mr. Nelson's recidivism risk. In particular, he completed testing related to sexual attraction to minors. The CASIC and CPORT measured static, or non-changeable, factors related to his offense and criminal history. The combination of these scores placed him in the possible category of pedophilic interest, as out of 100 individuals involved with child pornography material, Mr. Nelson would have a lower score than 72 of those individuals. Importantly, the factors related to his score other than his offense conduct was his status of being unmarried; and of 13 different categorical marks he only scored yes on 3 total items.[8] Regarding sexual deviance Dr. Gerth noted that while: "there is a possibility of a sexual attraction to minors, based on the behaviors involved in the offense. Although, Mr. Nelson does not have this in his history, rather he was typically in relationships with older female partners."[9] She went on to note that: "<u>When comparing Mr. Nelson to others who have committed sexual offenses, he is at low risk</u>."[10] Importantly, Mr. Nelson has a variety of protective factors in terms of his risk for recidivism such as a lack of criminal history or antisocial behavior, positive social support from his family, history of stable employment, motivation to change through engagement in treatment, and taking responsibility for his

---

[7] Taxman, F. S. (2014). Second generation of RNR: The Importance of Systemic Responsivity in Expanding Core Principles of Responsivity. Federal Probation, 78(2), 79- 9
[8] PSE- Pg. 11
[9] PSE- Pg. 14
[10] PSE- Pg. 16

actions in the present offense.[11] It is also important to acknowledge that research has found that the recidivism risk for non-contact offenders to be low. In fact, only "*6% committed a new sexual offense of some kind during a 1.5 to 6-year follow-up. More specifically, approximately two percent of child pornography viewers committed a contact sexual offense, and 3.4 percent committed a new child pornography offenses*."[12]

***Needs***

In terms of needs, Mr. Nelson is recommended to complete a comprehensive sex offender treatment program either in the Bureau of Prisons if available or in the community upon supervised release. The reason for this recommendation is that a variety of Mr. Nelson's risks can be effectively treated through therapeutic interventions, especially considering the fact that he has never done so before- either for mental health or sexual offense specific treatment or therapy. The evaluation notes that therapy is needed to 1) *increase insight into his mental health 2) learn prosocial coping skills 3) understand his thoughts and feelings related to his participation in the offense 4) build empathy and regulate his emotions*.[13]

***Responsivity***

The evaluation notes that while Mr. Nelson has a history of accommodations when he was in school, and his current testing did note some deficits with memory and language skills, overall, he has average intellectual functioning. This means that his cognitive

---

[11] PSE- Pg. 13
[12] National Library of Medicine, Contact sexual offending by men with online sexual offenses; MC Seto, RK Hanson, KM Babchishin; March 23, 2011.
[13] PSE- Pg. 15-16

functioning should not interfere with his capacity to complete treatment programming in a community-based setting, if it is not completed within a correctional environment. It is important to note that an inpatient level of care is not recommended due to his overall low recidivism risk.

## IV. DETERMINING THE SENTENCE

The Eighth Circuit has articulated a three-step sentencing procedure. *United States v. John H. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006). First, the Court is to determine the sentencing guideline range. *Id.* Second, the Court is to consider whether a departure is warranted under the guidelines. *Id.* Third, the Court should consider the factors enumerated in 18 U.S.C. § 3553(a) and determine the proper sentence based on the facts of the case. *Id.* In exercising its sentencing consideration, the Court is tasked with imposing "a sufficient sentence, but not greater than necessary" to comply with 18 U.S.C. §3553(a)(2). In so doing, the Court is to consider the factors articulated in 18 U.S.C. §3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Barron*, 557 F.3d 866, 868 (8th Cir. 2009).

### A. Parsimony Provisions and Factors

A thoughtful sentence requires the Court to thoroughly consider the Parsimony Provisions before imposing the sentence. 18 U.S.C. §3553(a). Such a sentence shall be sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553. *Id.* Such purposes the court shall consider include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentenced imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and

to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and the kinds of sentences available. *Id.* Moreover, Section 3553(b) authorizes the Court to impose a sentence outside of the recommended guideline range if mitigating circumstances exist that were not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. 18 U.S.C. §3553(b).

The Supreme Court in *Booker* held that the United States Sentencing Guidelines are advisory, and that District Courts must examine all the §3553(a) factors in order to impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *United States v. Booker*, 543 U.S. 220 (2005). The ensuing trio of 2007 Supreme Court cases made abundantly clear that District Courts must fashion individualized sentences based on the unique facts and circumstances of each case, and that the Guidelines emphatically do not enjoy a presumption of reasonableness. *See Gall v. United States*, 128 S.Ct. 586, 602 (2007) (probationary sentence substantially outside of Guidelines was reasonable and justified); *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)(sentencing courts may depart from Guidelines range based solely on policy considerations, including disagreements with Guidelines drug sentencing policies); *Rita v. United States*, 127, S.Ct. 2456, 2465 (2007)(sentencing courts may vary based on arguments that Guidelines sentencing range itself fails to comport with §3553(a) factors). The thrust of *Booker* and its progeny is "that the District Court is free to make its own

reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S.Ct. at 577 (Scalia, J., concurring).

The "Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S.Ct. 890 (2009). It is "uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). However, considering several Supreme Court cases, it is now truly incumbent on the sentencing court to "make an individualized assessment based on the facts presented" in each case. *Gall v. United States*, 128 S.Ct. 586, 602 (2007). District Courts "may not presume that the Guidelines range is reasonable." *Id*. at 597.

Because the District Court is in a uniquely "superior position to find facts and judge their import under § 3553(a)," the Appellate Courts must now review all sentences under an abuse-of-discretion standard, regardless of whether the sentence is inside or outside the Guidelines range. *Gall*, 128 S.Ct. at 597, 602. The Supreme Court has explicitly rejected the notion that extraordinary circumstances are required to justify a sentence outside the Guidelines range. *Id*. at 595. The Supreme Court also rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id*. So long as sentences that differ from the Guidelines are justified, a sentencing court's decision stands unassailable on appeal. *See*, *e.g.*, *United States v. Jiminez-Gutierrez*, 491 F.3d 923

(8th Cir. 2007)(affirming substantial downward departure that was justified on record, and noting that even where circuit courts disagree with the degree of a trial judge's departure, the discretion to make such decisions is within the sole province of the District Court); *United States v. Gonzalez-Alvorado*, 477 F.3d 648, 650 (8th Cir. 2007)(noting that a sentence that varies from the Guidelines range is reasonable so long as the judge offers appropriate justifications under §3553(a) factors).

After using the Guidelines to determine the initial benchmark and allowing the parties to argue their respective positions, the Court should then make an individualized assessment of the unique facts of the case based on the § 3553(a) factors. *Gall*, 128 S.Ct. at 596-97. "After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id*. at 597. Ultimately, this Court is charged with a duty to protect the public, as well as the civil rights of Mr. Nelson, with its experience, its wisdom, and the discretion vested in it by the Constitution and Congress.

**B. A Sentence Below the Recommended Guidelines is Appropriate.**

In determining an appropriate sentence, the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a). These factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; the need to protect the public from further criminal conduct; the need to provide the defendant with needed educational or

vocational training, medical care, or other corrective treatment in the most effective manner; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

Due to the seriousness of the instant offense, Mr. Nelson faces a sentence of between 15 and 30 years. He is 45 years old and is looking at spending the better part of his remaining, productive life in prison. He has never been married and has essentially lived a secluded life. His own insecurities have shrouded him with enormous burdens of self-doubt and anxiety, which have prevented him developing healthy social relationships with other people. The arrest, charges, being convicted, and staring at decades in prison has had a very sobering effect on Mr. Nelson. This is good, as it will deter him from engaging in this type of behavior in the future.

**C. Sentencing Guidelines Are Draconian.**

The sentencing guidelines for the types of crimes Mr. Nelson committed are, simply put, draconian and unreasonable. A life sentence recommendation, even with a 30-year cap, for a 45-year-old man with no criminal history is cruel and unnecessary. Yes, the crimes were terrible, but the recommended punishment goes far beyond what is necessary to satisfy the purposes of a sentence:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- to afford adequate deterrence to criminal conduct;
- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Nelson would clearly benefit from an extensive treatment regime to help him learn and grow in a controlled environment. He needs time to build confidence to develop quality relationships with others. Certainly, a significant punishment is appropriate, but that can be accomplished with a sentence far below what is recommended by the guidelines.

Mr. Nelson had never been in jail prior to his arrest in this case. He has been incarcerated at Sherburne County (and now most recently at Wright County) since January 4, 2025. Although Mr. Nelson undoubtedly knew his criminal conduct was legally (and morally) wrong, it seems unlikely he could have ever anticipated the severe consequences he would face when he committed these crimes.

## V. CONCLUSION

Mr. Nelson asks the court to impose a sentence of 180 months, which is the mandatory minimum. We believe such a sentence is sufficient, but not greater than necessary to accomplish the goals of sentencing. Such a sentence would provide just punishment for the offense; would act as a sufficient deterrent; and is consistent with the sentencing guidelines after considering in the §3553(a) factors.

Respectfully submitted,
DEVORE LAW OFFICE, P.A.

Dated: March 23, 2026

s/Kevin W. DeVore

Kevin W. DeVore (# 267302)
Attorney for Defendant
724 Bielenberg Drive, Suite 110
Woodbury, MN 55125
Telephone: (651) 435-6500